UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| JODY CARR,<br><br>                      Plaintiff,<br><br>vs.<br><br>ADA COUNTY SHERIFF STEPHEN BARTLETT, BILL WIERS, TRAVIS RUBY, and the officers involved in investigation of DR #19-3997,<br><br>                      Defendants. | Case No. 1:20-cv-00491-REP<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Plaintiff Jody Carr, an inmate in custody of the Idaho Department of Correction ("IDOC"), is proceeding on conspiracy, due process, and retaliation claims in his Amended Complaint. (Dkt. 17.) He asserts that Ada County Sheriff Stephen Bartlett, and two Ada County Sheriff's Office ("ACSO") investigators—William Weires[1] and Travis Ruby—violated Plaintiff's federal rights in conducting an investigation of his March 31, 2019, Prison Rape Elimination Act (PREA) letter alleging that he was sexually assaulted by another inmate on October 14, 2018, and January 7, 2019.[2] (*See* Dkt. 17, Amended

---

[1] This is the corrected name and spelling of "Bill Wiers."

[2] 34 U.S.C. § 30301, *et seq.*

**MEMORANDUM DECISION AND ORDER - 1**

Complaint.) Plaintiff alleges that Defendants intimidated inmate witnesses Robert LeGrotta and Anthony Barber, falsely reported that Plaintiff fabricated his PREA allegations, and impermissibly released Plaintiff's confidential information to IDOC prison officials.

After waiving service of process, Defendants filed an Amended Answer to the Amended Complaint. (Dkt. 29.) Now pending are cross-summary judgment motions filed by Plaintiff and Defendants. (Dkts. 35, 48.) Having reviewed the record in this matter, the Court enters the following Order.

## STANDARD OF LAW GOVERNING SUMMARY JUDGMENT

Summary judgment should be granted when a party can show that, as to a claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

To show that material facts are not in dispute, a party may cite to particular parts of the record or show that the adverse party is unable to produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

The Court does not determine the credibility of affiants or weigh the parties' evidence. All reasonable inferences that can be drawn from the evidence must be drawn

MEMORANDUM DECISION AND ORDER - 2

in a light most favorable to the non-moving party, *T.W. Elec. Serv.*, 809 F.2d at 630-31, but the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988). For example, when a videotape quite clearly contradicts the plaintiff's version of facts, courts should view the facts "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381-82 (2007).

In *Coble v. City of White House, Tennessee*, 634 F.3d 865 (6th Cir. 2011), the court applied *Scott* to an audio recording, reasoning:

> There is nothing in the *Scott* analysis that suggests that it should be restricted to cases involving videotapes. The *Scott* opinion does not focus on the characteristics of a videotape, but on "the record." 550 U.S. at 380–81, 127 S.Ct. 1769 ("When opposing parties tell two different stories, one of which is *blatantly contradicted by the record*...."; "Respondent's version of events is *so utterly discredited by the record*...."; "At the summary judgment stage ... once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record ... the reasonableness of [the respondent's] actions ... is a pure question of law." (emphasis added)). Although we have not had occasion to apply the *Scott* analysis to audio recordings, courts routinely look to *Scott* for guidance in determining whether the non-moving party's version of the events is so blatantly contradicted by objective evidence in the record that it fails to create a genuine issue of material fact for trial, even in the absence of a videotape.

*Id*. at 868–869. *See also Hearn v. Town of Oak Island*, No. 21-1598, 2022 WL 7935994, at *1 (4th Cir. Oct. 14, 2022) (unpubl.) ("To the extent the [audio recording] depicts material facts of this case, we review those facts as they are depicted in the [recording]" (citations omitted, brackets in original); *Clay v. San Bernardino Cnty*., No.

EDCV1900032-CJCDFM, 2021 WL 4804459, at *5 (C.D. Cal. Sept. 8, 2021), *report and recommendation adopted sub nom. Antquan Durpree Clay, Plaintiff, v. San Bernardino County et al., Defendants*., No. EDCV1900032CJCDFM, 2021 WL 4806544 (C.D. Cal. Oct. 13, 2021) ("As a preliminary matter, the Court must address Plaintiff's allegation that his assailants had retreated to their cells before he fired the taser. *See* Clay Decl. ¶ 7. The Court finds this purported evidence to be 'blatantly contradicted' by the audio recording of the event, such that 'no reasonable jury could believe it.' *Scott v. Harris*, 550 U.S. 372, 380 (2007).").

Similarly, a factual dispute cannot be created by contradicting oneself, for example, a later affidavit cannot be submitted in opposition to summary judgment that contradicts prior deposition testimony. *Kennedy v. Allied. Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).

Pro se inmates are exempt "from strict compliance with the summary judgment rules," but not "from all compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018). At summary judgment, courts "do not focus on the admissibility of the evidence's form," but "on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

## RELEVANT FACTS AND ALLEGATIONS

### 1. Timeline

The Court has constructed the following timeline from the evidence in the record and from the record in Plaintiff's related cases.

| **Date** | **Relevant Act or Occurrence** |
|---|---|
| December 14, 2015 | The Idaho Department of Correction (IDOC) and Ada County Sheriff's Office (ACSO) collaborated on a standard course of action to apply to allegations of serious crimes occurring at IDOC facilities. (Dkt. 42-5, p. 8 (sealed).) |
| April 7, 2016 | The IDOC and the Idaho Sheriff's Association (ISA) collaborated on a standard course of action regarding PREA complaints from inmates in custody of the IDOC (Dkt. 42-4, p. 5; *see* Dkt. 35-3, p. 21 (IDOC PREA pamphlet).) |
| November 21, 2017 | Plaintiff helped inmate James Davis make a PREA complaint against Corporal Cox, alleging that Corporal Cox attempted to sexually harass or assault Davis. Plaintiff claimed to be a witness to Cox's solicitation of Davis for sexual activity. (*See* Plaintiff's pleadings from Ada County Court Case CV01-19-05023 settled in the Global Settlement Agreement ("GSA"), found in federal Case 1:20-cv-00146-DCN Case, *Carr v. Page, et al.*, ("Case 146"), Dkts. 38 to 38-4.) |
| December 11, 2017 | Plaintiff drafted a civil rights conditions of confinement complaint against prison officials for inmate James Davis. (*See* Case No. 1:17-cv-00505-DCN, *Davis v. Atencio, et al.*, ("Case 505").) |
| March 28, 2018 | The IDOC served James Davis with a Disciplinary Offense Report ("DOR") for making a false statement about being sexually harassed or assaulted by Corporal Cox. (*See id.*) |
| April 18, 2018 | The IDOC served Plaintiff with a DOR for making a false statement that James Davis was sexually harassed or assaulted by Corporal Cox. (*See id.*, pp. 26-27.) |
| unknown date in 2018 | Plaintiff sent a PREA letter (of unknown content, not at issue here) to ISA (referenced in Dkt. 50, p. 14). |
| subsequent date in 2018 | The ISA forwarded Plaintiff's PREA letter to the IDOC PREA Coordinator, Teresa Jones (*See id.*). |
| June 14, 2018 | Plaintiff drafted a second civil rights complaint for James Davis in federal court that was assigned to District Judge B. Lynn Winmill, Case 1:18-cv-00274-DCN, *Davis v. Blades, et al.* ("Case 274"). In the complaint, Plaintiff asserted for Davis |

**MEMORANDUM DECISION AND ORDER - 5**

that prison officials harassed Davis so much that Davis attempted suicide, that Corporal Cox sexually harassed Davis, and that prison officials tried to cover up the Corporal Cox sexual harassment incident.

| | |
|---|---|
| October 12, 2018 | IDOC (Jones) sent a letter to Plaintiff stating that she reviewed Plaintiff's letter and saw no new PREA allegation requiring investigation. |
| October 14, 2018 | Plaintiff later alleges that inmate James Davis allegedly sexually assaulted him on this date, but Plaintiff told no one on this date. Plaintiff later said he did not report it due to "no way to confidentially or safely report it." (Dkt. 50-2, p. 3.) |
| November 30, 2018 | Upon screening, Judge Winmill dismissed all of Davis's claims in his second civil rights action except claims against Corporal Cox. (*See* Dkt. 7 in Case 274.) |
| January 7, 2019 | Plaintiff later alleges that James Davis sexually assaulted him on this date, but, Plaintiff again told no one on this date. Plaintiff later said he did not report it due to "no way to confidentially or safely report it." (*Id.*) |
| February 13, 2019 | James Davis filed a motion to dismiss and withdraw his first civil rights complaint drafted by Plaintiff. (*See* Dkt. 43 in Case 505.) |
| March 31, 2019 | Plaintiff wrote a letter to the ISA stating that he had been sexually assaulted by Davis on October 14, 2018, and January 7, 2019. (*See* Dkt. 50, p. 20-21.) Plaintiff alleges that he gave the letter to prison paralegal Cupp for indigent mailing. ISA did not receive the letter from Plaintiff; neither did ACSO receive the letter from the ISA. (*See* Dkt. 42-4, p. 2, Declaration of Tammara Tarvin; Dkt. 42-5, p. 2, Declaration of William Weires; Dkt. 42-6, p. 2, Second Declaration of Travis Ruby.) |
| April 3, 2019 | James Davis filed a motion to withdraw his second civil rights complaint drafted by Plaintiff. (*See* Case 274, Dkt. 14.) |
| April 4, 2019 | Plaintiff signed and dated a state habeas corpus petition, wherein he declared under penalty of perjury: "Now, on 3-31-19 I sent another PREA complaint letter to the Id. Sheriff's Ass. and yesterday (4-3-19) paralegal Cupp returned it to me |

**MEMORANDUM DECISION AND ORDER - 6**

marked "Denied". I have no way to gain Relief or Safety. Petitioner desperately needs this Court's Help." (Dkt. 4-1, p. 12, in Case 1:20-cv-00301-DCN, *Carr v. Cupp* ("Case 301") (verbatim)). Plaintiff then submitted his petition to Cupp for filing in the Ada County court, but she returned it "denied," and did not file it. (Dkt. 44, pp. 3-7 (sealed).)

| | |
|---|---|
| April 7, 2019 | Plaintiff wrote a letter to the Idaho Commission of Pardons and Parole (ICPP) stating that they should not parole inmate James Davis because Plaintiff was sexually assaulted by Davis and because Davis allegedly told Plaintiff that Davis would "go on a raping and killing spree out of his venge[a]nce" and "kidnap & keep as a sex slave his own daughter" if paroled. (Dkt. 44, pp. 3-5 (sealed).) |
| April 10, 2019 | Plaintiff wrote a letter to Chad Page, IDOC Chief of Prisons, informing him of the alleged Davis October 14, 2018, and January 7, 2019 sexual assault incidents. (*Id.*, pp. 4-7.) In that letter, Plaintiff again said he wrote a confidential letter to the ISA on 3-31-19, but officers said they could not mark it confidential; he then submitted it to paralegal Cupp, who marked it "denied" and brought it back to him because it was not an access to courts claim. |
| April 15, 2019 | IDOC investigator Nicole Fraser emailed Defendant William Weires of the Ada County Sheriff's Office (ACSO) to ask the ACSO to look into PREA concerns identified in the April 7, 2019 letter written by Plaintiff to the ICPP. (*See* Dkt. 44, p. 2 (sealed).)[3] |
| April 16, 2019 | Fraser provide Weires with the letter Plaintiff wrote to Chad Page, expressing the same PREA concerns. (Dkt. 44, pp. 2-7 (sealed).) |

---

[3] Plaintiff states in his "Supplement to All Pleadings" that "Nicole Fraser, and her investigation's team… had Plaintiff Sexually Assaulted, and Violently Assaulted by their Hired and Paid Inmates as Retaliation for Plaintiff daring to try to Report them." (Dkt. 54, p. 3 (verbatim).) This allegation of a pre-April 2019 IDOC-inmate conspiracy to harm Plaintiff is directly contrary to Judge Nye's Order that Plaintiff not reach back into his prior cases settled in the GSA. Plaintiff was sanctioned for breaching the GSA in Case 146. (*See* Dkt. 59 in that case.) Evidence in this case also shows that Plaintiff breached the GSA confidentiality clause by revealing the outcome of his suit to various inmates. (*See* Dkt. 38-1; Dkt. 37 (sealed).)

**MEMORANDUM DECISION AND ORDER - 7**

|  | Plaintiff wrote a letter to the IDOC Attorney General's Office, stating that James Davis sexually assaulted him twice. (Dkt. 44-2, pp. 3-6.) |
|---|---|
| April 22, 2019 | Lt. Greenland notified Sergeant Anderson that Plaintiff had given him two concern forms that contained possible PREA allegations that James Davis assaulted Plaintiff on 10/14/18 and 1/7/19, but that Plaintiff said he "wasn't able to confidentially report because he didn't trust staff, due to receiving a DOR from making false statements," which references the IDOC's finding that Plaintiff made false statements that Corporal Cox had sexually harassed or assaulted James Davis. (IDOC Information Report dated 4/22/19, Dkt. 50-2, p. 12.) |
|  | IDOC (Anderson) interviewed Plaintiff and passed the information on to Ada County detectives at the direction of IDOC leadership. Ada County detectives started a formal investigation (DR #19-3997) (reported in DOR, Dkt. 50-2, p. 7). |
| April 23, 2019 | IDOC (Fraser) provided Weires with a letter written by Plaintiff to the IDOC Attorney General's Office, dated April 16, 2019, expressing the same PREA concerns. (Dkt. 44-2, p. 2 (sealed).) |
|  | Weires assigned Travis Ruby to follow up on the PREA disclosure at ISCC. (Dkt. 42-6, Second Ruby Decl.) |
| April 23, 2019 | Ruby interviewed Plaintiff Jody Carr. During the interview with Ruby, Plaintiff informed Ruby that he did not report his PREA incidents directly to ISA because his cellmate previously had tried to use that route, but IDOC officials had intercepted his cellmate's letter, and his cellmate later attempted suicide as a result, so Plaintiff chose a different route for his own PREA complaint—the Chad Page letter. (Dkt. 37, audio recording; Dkt. 42-6, Second Ruby Decl.) Plaintiff also told Ruby that Plaintiff helped another inmate make a PREA complaint and Plaintiff was disciplined for making a false statement for that. Plaintiff did not tell Ruby that the cellmate who had tried to commit suicide was James Davis—the same inmate Plaintiff was now accusing of sexually assaulting him. Nor did Plaintiff tell Ruby the inmate who made the PREA complaint for which Plaintiff was |

MEMORANDUM DECISION AND ORDER - 8

disciplined for making a false statement was James Davis. Plaintiff told Ruby that Plaintiff had begun to have trouble with Davis, who had been a "witness" to the alleged physical assaults of inmate Marzullo-Trainer on Plaintiff that formed the basis of his claims that he was settling with the IDOC in the GSA, because Davis had begun to tell investigators that the physical assault claims were untrue, jeopardizing Plaintiff's claims. Plaintiff told Ruby that Plaintiff would "love it" if Davis were criminally prosecuted for sexually assaulting him. Plaintiff told Ruby Plaintiff did not have funds to buy new boxer short-style underwear or make a telephone call and had been "indigent" and "poor" during his ten years of incarceration. (Dkt. 37, audio recording (sealed).)

Before Ruby left the IDOC premises, he informed IDOC staff that he would be continuing his investigations into Plaintiff's PREA concerns. (Dkt. 56-1, p. 5, Ruby Interrogatory Responses.)

| | |
|---|---|
| April 25, 2019 | Ruby interviewed alleged perpetrator, inmate James Davis. (Dkt. 38-1, ACSO Report DR #19-3997, and Dkt. 37, audio recording (sealed).) |
| April 26, 2019 | Plaintiff settled seven lawsuits in the GSA, including Case 1:17-cv-00167-DCN, *Carr v. Zmuda, et al.* ("Case 167"), that alleged, "Sgt. Nicodemus used unfavorable housing as a threat to dissuade [Plaintiff] and other P.C. inmates [from] filing … PREA complaints, notices of tort claim, and civil rights complaints § 1983s." (Dkt. 19, p. 1, in Case 167 (grammar and capitalization regularized).) |
| April 29, 2019 | Davis passed a polygraph examination, which officials believed confirmed that he did not sexually assault Plaintiff. (*See* Dkt. 38-1, Ruby Decl. and ACSO Report DR #19-3997 (sealed).) |
| May 1, 2019 | Ruby began writing ACSO Report DR #19-3997. (*See* Dkt. 38-1 (sealed).) |
| May 21, 2019 | Plaintiff reported in a grievance: "Due to conspiracy of investigations officer c/o Lytle & possibly Cpl. Fras with inmate James m. Davis #92595, to discredit my Testimony & allegations of staff corruption Davis Extortin me, sexually Assaulting me Twice with no way to confidentially or safely |

**MEMORANDUM DECISION AND ORDER - 9**

report it, Davis lying to get Fras to take my legal property & Davis planning to Rape & Murder staff's families, Judge Winmill's Family, I told winmill he called IDOC to protect me due to their conspiracy "investigation" protected Davis on D-2 & on 4/8/19, threw me in close custody 22 1/2 hour a day lockdown D1 (most violent Tier in IDOC) exactly as davis extorted me for PREA" (Dkt. 50-2, p. 3 (verbatim).) As of result of these allegations, the United States Marshal Service came out to the prison and interviewed James Davis. (*See* Dkt. 37 (audio recording of Ruby interviews) (sealed).)

| | |
|---|---|
| July 3, 2019 | Ruby interviewed an inmate witness. (Dkt. 38-1, ACSO Report DR #19-3997, Dkt. 37, audio recording (both sealed).) |
| July 9, 2019 | Ruby interviewed inmate witness Robert LaGrotta in the presence of an IDOC investigator for about 44 minutes. Then the IDOC investigator interviewed LaGrotta in the presence of Ruby. (Dkt. 37 (sealed).) |
| September 19, 2019 | Ruby completed his report and submitted it to the Ada County Prosecutor to consider prosecution of James Davis. (Dkt. 48-3, Third Ruby Decl.) |
| January 16, 2020 | Ruby prepared a supplement to his report showing that the Ada County Prosecutor declined prosecution. (Dkt. 38-1.) |
| March 17, 2020 | IDOC (Anderson) received the sealed report with findings of the investigation under a cover letter from Ada County administrative personnel. (*See* Dkt. 7 in Case 1:20-cv-00315-DCN, *Carr v. Miller* ("Case 315").) |
| March 27, 2020 | IDOC (Anderson) wrote Plaintiff a Disciplinary Offense Report ("DOR"), #201677, for a "false statement." The DOR findings, in part, were: "The collective evidence shows that Inmate Carr made false statements that resulted in a formal investigation by the Ada County Sheriff's department." (Dkt. 50-2, p. 7.) |
| April 1, 2020 | At 3:05 p.m., IDOC Warden Jay Christensen wrote an email to Anderson in response to a forwarded email to Christensen about the outcome of Carr's DOR, saying "Nothing but Net!!!! Now the truth about him will be exposed to the courts." The email shows: "Carr #79004 (DHO [disciplinary |

hearing officer] confirmed) 4; Offense: #26. False Statement 1 - B. Sanction: 20 Days Commissary restriction: 4/01/20-4-21/20; 10 Days Recreation restriction: 4/01/20-4/11/20." (Dkt. 3-1, p. 1, in Case No. 1:22-cv-00396-DCN, *Carr v. Christensen, et al.* ("Case 396"). The email's existence and time is undisputed fact. Plaintiff alleges that Warden Christensen wrote the email minutes *before* the DOR hearing was held—a fact which has not been proven and is addressed here only to point out to Plaintiff that it is neither undisputed nor material.

Plaintiff alleges that, at 3:17 p.m., IDOC DHO Adam Miller held Plaintiff's hearing for DOR #201677. Plaintiff alleges the DOR hearing start time was "not until 3:17 PM on 4-1-20 *if my memory and Journal Notes are correct.*" (Dkt. 3, p. 3 in Case 396.) Nothing in the record corroborates the starting time of the DOR hearing or the alleged time discrepancy between the hearing and the Christiansen response to the forwarded email from Sergeant Anderson.[4]

April 5, 2020            Anthony Barber signed an Affidavit for Plaintiff, saying: "Close to a year ago, ISCC investigation guards were searching the tier for any inmates that would say Carr was a liar, and/or that Carr was trying to get inmates like myself to lie for him about his suffering. These guards threatened me twice and I said to them, "I want to keep my head down, and mouth shut," because I was unable to face the retaliation dished out at the hands of the correctional officers that act as

---

[4] Even if prison officials reviewed the ACSO report and decided before the DOR hearing that the report constituted "some evidence" under *Superintendent v. Hill*, 472 U.S. 445, 455 (1985), to find Plaintiff guilty at the upcoming DOR hearing, that decision does not translate into a conspiracy to deprive Plaintiff of his constitutional rights. Plaintiff litigated the propriety of the Dor guilty finding and the sanction in Case 315, and Judge Nye found that Plaintiff had no liberty interest in not receiving the "light sanctions" as discipline for the false statements. Therefore, is immaterial whether, prison officials together decided Plaintiff's fate before the hearing, because the act did not result in deprivation of a constitutional right. Judge Nye also found that the ACSO report, in fact, constituted "some evidence," and that Plaintiff's rebuttal to the evidence was insubstantial, (*see* Case 315, Dkt. 20, pp. 5-11), which means Plaintiff would have lost the DOR contest, regardless whether the outcome was decided beforehand or not, and that all of this was nothing more than what could be expected during the regular course of incarceration as a convicted felon.

In any event, this 2020 "nothing but net" email passing between IDOC officials does not show they were in conspiracy with ACSO officials in 2019; it does not show anything about these ACSO Defendants.

**MEMORANDUM DECISION AND ORDER - 11**

|  | if they can do whatever they wish, threatening me with criminal charges if I were to stick up for Carr." (Dkt. 17-1, p. 14; Dkt. 35-4, p. 13.) |
|---|---|
| April 5, 2020 | Deputy Warden McKay affirmed DOR #201677 on 4/05/2020. (Dkt. 3, p. 3 in Case 396. (Dkt. 50-2, p. 8).) |
| April 7, 2020 | Warden Christensen, the appellate authority on DOR #201677, affirmed the DOR finding of making a false statement. Dkt. 3, p. 3 in Case 396. (*Id.*) |
| April 20, 2020 | Robert LaGrotta signed an Affidavit for Plaintiff, stating: "That, very soon after [June 12, 2019], 'Admin' had Ada County Detective and ISCC Investigation Officer pull me out and question me. That, they even read me my rights. that, this scared me but I stuck up for Carr by telling the truth explaining he wasn't doing anything wrong or harmful either towards others or himself. That, this approach and truth seemed to bother them, and even upset them. So in fear of what they'd do to me, I took their side saying 'maybe' Carr was up to something and his intent maybe [sic] to cause legal issues. That, I did this out of fear of retribution because ISCC and IDCO Admin use housing transfers, DOR's, and even criminal charges to retaliate against inmates like Carr and those who back him with witness statements or grievances…. That, IDOC official successfully intimidated me into making my friend Jody Carr look bad. I didn't know what else to do to protect myself." (Dkt. 35-4, pp. 6-7.) |
| January 5, 2021 | Travis Ruby signed a Declaration about his investigation report that was submitted in Case 315. (*See* Dkt. 8 in that case (sealed).) |
| October 18, 2021 | Plaintiff filed a Complaint in federal court for himself and many other inmates seeking class action status for conditions of confinement claims, including PREA violations. (*See* Case 1:21-cv-00409-BLW-DKG, *Carr, et al. v. Tewalt, et al.* ("Case 409").) |
| May 5, 2022 | Plaintiff's claims in Case 409 are severed into a separate case for potential violations of the GSA. (*See* Dkt. 19 in Case 409 (provided to Plaintiff; sealed from remainder of plaintiffs and the public in Case 409).) |

December 12-13, 2023         Inmates in Case 409 testify at a court hearing consistently with other inmates' testimony in the 2019 ACSO Report DR #19-3997, regarding Plaintiff's role in exaggerating PREA allegations in the civil rights pleadings Plaintiff drafted for the other inmates. (*See* Dkts. 135, 136 in Case 409 (sealed).)

## 2. Facts Limited by Prior Settlement Agreement

Plaintiff's Complaint originally contained allegations that ACSO investigators conspired with IDOC officials to violate Plaintiff's civil rights. (Dkt. 3.) But Judge Nye found that these conspiracy allegations violated the GSA, a prior confidential settlement agreement signed by Plaintiff, the State of Idaho, and Ada County. (Dkt. 11; *see* Dkt. 15, GSA in Case No. 1:18-cv-000247-DCN ("Case 247") (provided to Plaintiff, but sealed from the public.) Judge Nye required Plaintiff to amend his pleadings to omit any such references. The Court has taken judicial notice of the GSA executed on April 26, 2019, terminating the following seven cases: United States District Court District of Idaho Case Nos. 1:13-cv-00380-REB, 1:14-cv-00125-BLW, 1:15-cv-00133-CWD, 1:16-cv-00182-DCN, 1:17-cv-00167-DCN, and 1:18-00247-DCN, as well as Ada County Fourth Judicial District Court Case No. CV01-19-5023.

Accordingly, the GSA delineates the boundaries of the "facts" upon which the parties can rely. Plaintiff may not rely upon any factual allegations about IDOC officials conspiring with anyone against him arising before April 26, 2019.

## 3. Allegations Blatantly Contradicted by Record

Based on the evidence in the record, the Court agrees with Defendants that Plaintiff's foundational factual assertion that he actually submitted his March 31, 2019

**MEMORANDUM DECISION AND ORDER - 13**

PREA letter to ISA is blatantly contradicted by the record. (Dkt. 17, pp. 1-2.) The record indisputably shows—through Plaintiff's own writings and words—that the letter was rejected and returned to him by IDOC officers and rejected and returned to him a second time by IDOC paralegal Cupp on April 3, 2019. Plaintiff himself told Detective Ruby that he did not submit the letter to the ISA, but instead made his PREA report directly to Chad Page; the Chad Page letter is contained in the record. (See Dkt. 44, pp. 2-7 (sealed).)

Abundant undisputed evidence in the record shows that Plaintiff himself notified IDOC and ICPP officials of the PREA factual allegations in at least three different ways prior to the start of the ACSO investigation on April 23, 2019, and these methods of notification, in fact, were the impetus for the ACSO investigation. Besides the letter Plaintiff sent to Chief of Prisons Chad Page, he submitted a letter to the ICPP and two inmate concern forms to Sergeant Greenland—all of these referenced the same "confidential" facts supporting his PREA allegations. Therefore, the Court deems it undisputed that ISA and ACSO never received Plaintiff's March 31, 2019, PREA letter requesting confidentiality assurances.

### RECONSIDERATION OF PLAINTIFF'S
### ADDITIONAL DISCOVERY AND UNSEALING REQUESTS

Because Defendants asserted that many of the claims were subject to defenses of failure to state a claim and qualified immunity, the Court denied Plaintiff's request to compel discovery and his request to view the sealed ACSO report. (Dkt. 58.) However, the Court notified the parties that it would re-evaluate Plaintiff's need for further discovery and for the sealed documents during summary judgment consideration. (*Id.*)

### 1. **Further Discovery**

Pursuant to the Court's Standard Disclosure and Discovery Order for Pro Se Prisoner Cases (Dkt. 21), the parties engaged in disclosures and discovery. Plaintiff persists in asserting that all government officials are in a continuous conspiracy against him to deprive him of his civil rights. Plaintiff has presented insufficient evidence from the appropriate time frame to support existence of such a conspiracy. The Court is aware that it might be difficult for a prisoner to obtain such evidence, and so the Court has scoured the record of this case and his other related cases to determine whether further discovery would aid him in his endeavor.

As noted above, the GSA prohibits Plaintiff from using conspiracy allegations arising *before* April 26, 2019, to prove his case that IDOC officials were in conspiracy with each other and with ACSO Defendants. Here, both sexual assaults occurred prior to April 26, 2019, and the critical communications between IDOC officials and ACSO Defendants also occurred before that date. Evidence that arose *after* the ACSO investigation—such as the IDOC Disciplinary Offense ("DOR") proceedings and the "nothing but net" email—has nothing to do with the ACSO Defendants here.

The Court again has reviewed Plaintiff's requested discovery and determined that it would not make a difference to the viability of his claims. Plaintiff has not shown that further discovery would yield anything productive.

Plaintiff asserts that he has never received correspondence showing that ACSO produced its report to the IDOC no earlier than March 16, 2020. Dkt. 56. (Plaintiff speculates that the conspiracy between the ACSO and the IDOC began much earlier—

**MEMORANDUM DECISION AND ORDER - 15**

but, again, that reaches back into the GSA-prohibited time frame.) The ACSO correspondence is found in the sealed report in Case 1:20-cv-00315-DCN (Case 315), at Docket 7 ( IDOC Bates No. 000002). Plaintiff wants to know the name of the ACSO administrative person who provided it, which is not necessary to this litigation. It is necessary only that Plaintiff know that no Defendant sent the correspondence. (Dkt. 56-1, p. 2.)

Similarly, Plaintiff's at-issue Requests for Admissions would not produce anything productive. For example, Plaintiff asks: "Please admit, that, on 3/31/2019 a Prison Rape Elimination Act (PREA) complaint letter was sent through Idaho Department of Corrections (IDOC) PREA Pamphlet's "External Confidential Report" address, e.g., Idaho Sheriff's Association, 3100 Vista Avenue, Suite 203, Boise, ID 83706." (Dkt. 56, p. 13.) But Plaintiff never sent his letter. Even if he did, the Request for Admission is drafted so badly, it qualifies as unanswerable. What does Plaintiff mean by "sent through" an address? Does he mean that he submitted a letter to the IDOC for mailing, because it is clear that it was never mailed. Or is he insisting, against a mountain of his own admissions, that it was mailed to and received by ISA? And how would these ACSO Defendants know anything about Plaintiff and IDOC's dealings regarding whether letter was "sent through" the ISA? Further, this line of inquiry about something Plaintiff *knows did not happen* is frivolous and wasteful of public resources. The ACSO Defendants appropriately objected to and denied this request.

Plaintiff also vaguely argues that Defendants contradicted themselves in discovery and in filings made in other cases, and he should have opportunity to probe the

**MEMORANDUM DECISION AND ORDER - 16**

contradictions. He makes no particular arguments, but attaches the discovery for the Court to hunt for something to support this vague allegation. The tongue-in-cheek adage—"Judges are not like pigs, hunting for truffles buried in briefs"—coined in *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991), applies here. Judges are not required to expend limited public resources hunting for extraneous facts in exhibits to support arguments not plainly made in the briefing. Nevertheless, the Court has searched through the proposed discovery.

When Plaintiff refers to contradictions and lies, it is clear that he is not considering that human perspectives differ on what the wording of a question and the wording of an answer mean; the party asking the question may mean something completely different from the way the answering party interpreted the question. For that reason, the Court will not compel Defendants to answer Plaintiff's interrogatory that asks, "If you answered yes to Interrogatory #8 and/or #9, That is contrary to your previous Answers and Responses wherein you Swore under Oath. So, Interrogatory is [sic], were you lying on your first Answers and Responses, or are you lying now." (Dkt. 56-1, p. 6.) Here, it is clear that Plaintiff's perspective is that the individual Defendants should have answered his questions on behalf of the entity ACSO, but Defendants have answered on behalf of themselves only, because the entity is not a defendant against whom Plaintiff was authorized to proceed. The Court sees no obvious untruthful statements among the disclosures and discovery responses these individual Defendants have provided, and it finds that no further discovery would change the outcome of this case.

2. **Sealed Documents**

Public access to court dockets may be denied if the court determines that filed documents may be used for improper purposes. *See Nixon v. Warner Communications,* 435 U.S. 589, 598 (1978); *Hagestad v. Tragesser,* 49 F.3d 1430, 1433–34 (9th Cir. 1995). Courts should consider "the interests advanced by the parties in light of the public interest and the duty of the courts." *Id.* at 1434 (quoting *Nixon,* 435 U.S. at 602). The Supreme Court has acknowledged that the decision to seal documents is "one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Nixon,* 435 U.S. at 599. After taking all relevant factors into consideration, the district court must base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture. *Hagestad,* 49 F.3d at 1434.

Because it is a party demanding access to sealed documents, not merely an interested member of the general public, the Court has reconsidered whether due process and fair play require disclosure of the confidential investigation report, declarations of jail and prison officials, interviews of inmate witnesses, and court testimony of inmate witnesses. For the following reasons, the Court finds that disclosure should not be made.

First, the totality of the record strongly supports Defendants' position. As shown above, Plaintiff's position that he submitted the March 31, 2019 letter to the ISA blatantly contradicts the record. Further, Plaintiff's position that ACSO Defendants intimidated witness Robert LaGrotta blatantly contradicts the audio recording and the record. Plaintiff's position that ACSO Defendants intimated witness Anthony Barber has no

support even in Barber's own sworn Affidavit, and nothing shows Defendants interviewed or had contact with Barber at all. The sealed evidence does not contain facts that would support Plaintiff's position on any of his claims; therefore, no benefit would come from disclosing it to him.

The Court has probed the issue of the risk of harm to other inmates if disclosure is made. Plaintiff's cases, including this litigation and the proposed class action lawsuit he began (Case 409), show that he had a particular litigation goal in mind—to bring a PREA-based lawsuit against a governmental entity. His cases also show that he is willing to make exaggerated or unfounded harmful allegations about others accomplish his purpose—including inmate James Davis, inmate James Wolfe, inmate Robert LaGrotta, and the inmates in his other cases.

The chronology of James Davis's interactions with Plaintiff show that Plaintiff turned on Davis. Initially, Plaintiff drafted civil rights complaints for Davis and "helped" Davis make a PREA sexual assault complaint. This resulted in Davis being issued a DOR for making a false statement to (1) accusing Davis of sexually assaulting him, (2) telling parole officials that Davis planned to go on a raping and killing spree and make his own daughter a sex slave if paroled, and (3) telling IDOC officials that Davis planned to kill prison staff, federal court judges, and their families (allegedly because Judge Winmill permitted Davis to proceed on only limited claims in the Initial Review Order issued in Davis's case). It also caused Davis to endure an interview with the United States Marshal Service. In the interview with Ruby, Plaintiff, who admittedly was poor, revealed a motive for having turned against Davis—that Davis's interviews with other investigators

**MEMORANDUM DECISION AND ORDER - 19**

about whether or not Plaintiff was actually assaulted by inmate Marzullo-Trainer were jeopardizing his GSA settlement. If that were not enough, Plaintiff chronicled even more alleged wrongdoings, mental health issues, and character flaws of Davis in Plaintiff's pleadings in Cases 315, 1:20-cv-00303-DCN, *Carr v. Dietz and Nicodemus* ("Case 303"), and 1:22-cv-00332-JCC, *Carr v. Judge Nye, Judge Winmill, et al*. ("Case 332").

This history shows that, to accomplish his personal litigation goals, Plaintiff made serious and potentially life-altering allegations against Davis. The United States Marshal did not arrest Davis, and the United States Attorney's Office did not institute a criminal action against Davis for "threatening to kill Judge Winmill and his family." The sexual assault allegations made by Plaintiff were dispelled by Davis's polygraph. The record reflects that the Ada County Prosecutor declined to prosecute Davis based on Plaintiff's allegations and the totality of the record that contains many different pieces of evidence that together show Plaintiff's allegations of sexual assault are untrue.

Next, Plaintiff was once was a friend to former cellmate, James Wolfe, but Plaintiff turned against Wolfe, like he did with Davis. (*See* allegations about Wolfe made in pleadings in Cases 306, 315, and 332.) When put to the test, Plaintiff was unable to state a claim against prison officials who allegedly hired Wolfe to harm Plaintiff. Therefore, Plaintiff's claims based on Wolfe's "conspiracy" with IDOC officials were dismissed with prejudice for failure to state a claim upon which relief can be granted in Case 146 (Dkt. 44 (available to Plaintiff but sealed from the general public).)

Even inmate witness LaGrotta—whose audio-recorded interview shows he remained true to his original assertions about Plaintiff—was convinced by Plaintiff to

contradict and excuse himself in an after-interview affidavit that forms the basis of this suit. ASCO Interviewer Travis Ruby did not intimidate LaGrotta, nor did the IDOC investigator present at the interview, and LaGrotta did not substantially change his story during the interview. Plaintiff's suit is based on incorrect speculation.

In summation, Plaintiff's litigation history reflects what one inmate witness observed: "Carr is willing to use whoever he wants to get what he wants…. Carr just won a lawsuit and had all of his DOR's removed from his record…. Carr is willing to find some young kid to do something that would ruin that kid's life...." (Dkt. 38-1, ACSO Report DR #19-3997 (sealed).) An inmate who was the target of Plaintiff's false allegations said he was targeted because "Carr is very upset with him, and this is what Carr does when he is upset with someone." (*Id.*)

A witness Ruby interviewed testified that Plaintiff drafted a set of affidavits about having witnessed PREA incidents, took them around the tier, and asked each inmate to rewrite the affidavit in his own hand and sign it regardless of whether information in the affidavit was true. (Dkt. 37, audio recording of interviews (sealed).) That statement was supported by different inmates' testimony in a hearing in Case 409 that Plaintiff exaggerated or fabricated their allegations that they had witnessed multiple PREA incidents when he drafted their pleadings in that case, although, as a frequent litigator, Plaintiff is well aware of Rule 11, perjury, or other potential sanctions that the inmates who trusted Plaintiff might suffer). (*See* Dkts. 135, 136 in Case 409 (sealed); *see* Case 409, Dkt. 48, pp. 2-11 (providing examples of previous cases where Plaintiff exaggerated claims of other inmates or injected himself into their cases, with one inmate stating that

he gave Plaintiff $60 and "woman photo's and a woman catalog" [sic] in exchange for

Plaintiff's drafting of that inmate's pleadings).)

      If the foregoing specific examples are not enough, declarations of jail and prison

personnel submitted in this case confirm that inmates who speak to government

investigators are often tagged as "snitches" by other inmates, putting them at risk for

inmate retaliation. (*See* Dkt. 38, Declaration of Nicole Fraser; Dkt. 38-1, Declaration of

Travis Ruby; Dkt. 41-1, pp. 27-31, Declaration of Jay Christensen (filed by Plaintiff;

originally filed in Case 315).) In addition, investigators state that prison security and

county investigation tactics would be compromised if investigative reports and interviews

were disclosed to Plaintiff. (*See id*.)

      Finally, the Court finds that the ability of the United States Court of Appeals to

review the sealed documents found in the record and in Plaintiff's litigation history fills

the due process void where Plaintiff is not permitted to view evidence for security

reasons. The Court of Appeals can review the discretionary decisions of this Court in

light of the sealed items relied upon in its decisionmaking. "Lawful incarceration brings

about the necessary withdrawal or limitation of many privileges and rights, a retraction

justified by the considerations underlying our penal system." *Jones v. North Carolina

Prisoners' Labor Union, Inc*., 433 U.S. 119,125 (1977) (citation and punctuation

omitted). Being able to review documents that pose multiple threats to other inmates is an

appropriate prohibition resulting from having committed a serious crime against society.

Because the inmates who have had dealings with Plaintiff are at risk of retaliation from

**MEMORANDUM DECISION AND ORDER - 22**

Plaintiff or other inmates, the Court concludes that the sealed evidence in this record must remain sealed.

## REVIEW OF CLAIMS AND DEFENSES

### 1. Ada County Conspiracy Claim

Because of GSA limitations, Judge Nye narrowed Plaintiff's IDOC-ACSO conspiracy claims to permit him to proceed on only a narrow claim that the three ACSO Defendants "created, adopted, and/or enforced customs and/or policies to violate confidentiality assurances to inmates like [Carr], in order to assist IDOC officials in covering-up crimes and deprivations of constitutional rights to prisoners in the jurisdiction of Ada County." Plaintiff's broad IDOC-ACSO conspiracy theory was based on facts that began in October 2018, during the GSA-covered time frame ending April 26, 2019.

The elements of a claim of conspiracy to deprive another of his civil rights are: "(1) the existence of an express or implied agreement among the [defendants] to deprive [the plaintiff] of his constitutional rights, and (2) an actual deprivation of those rights resulting from that agreement." *Ting v. U.S.*, 927 F.2d 1504, 1512 (9th Cir. 1991) (*Bivens* action relying on § 1983 case, *Dooley v. Reiss*, 736 F.2d 1392, 1394-95 (9th Cir. 1984)). To allege a conspiracy, the plaintiff must bring forward plausible factual allegations showing "an agreement or 'meeting of the minds' to violate constitutional rights." *See Fonda v. Gray*, 707 F.2d 435, 438 (1983) (citation omitted). Each conspirator "need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Id.* (citation and punctuation omitted).

**MEMORANDUM DECISION AND ORDER - 23**

Defendants first persuasively argue there is insufficient evidence in the record to show that Plaintiff actually submitted the March 31, 2019, PREA letter asking for "confidentiality assurances" to the ISA, or that the ISA provided the letter to the ACSO. Accordingly, Defendants are entitled to summary judgment for Plaintiff's failure to support this element of a conspiracy claim.

Next, Defendants persuasively argue that any causal link between the ISA or the ACSO violating an alleged "confidentiality assurances" duty was broken or superseded by Plaintiff's own separate communications with IDOC and ICPP officials, providing them with the information that he allegedly wanted to keep secret from them. An essential element of a § 1983 case is that the plaintiff show that the defendants' actions proximately (meaning legally) caused the deprivation of a constitutional right. 42 U.S.C. § 1983; *Arnold v. International Business Machines Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981). Defendants did not proximately cause Plaintiff's alleged damages. Defendants, therefore, are entitled to summary judgment for Plaintiff's failure to support the causation element of a conspiracy claim.

Defendants next argue that Plaintiff's conspiracy claim fails because the object of a civil rights conspiracy must be a violation of a person's constitutional or federal statutory rights, and Plaintiff has no constitutional or statutory right to have his PREA complaint remain confidential from his custodians, the IDOC officials. Even assuming for the sake of argument that ACSO investigators received their information about Plaintiff's PREA complaints from the ISA, and not from the IDOC's disclosure of

**MEMORANDUM DECISION AND ORDER - 24**

Plaintiff's own correspondence with state government officials, Plaintiff has not shown that he had a statutory right to "confidentiality assurances."

Nothing in PREA shows that lawmakers included any such "right" in the statute. The stated purposes of PREA includes preventing prison rape and "increas[ing] the available data and information on the incidence of prison rape, consequently improving the management and administration of correctional facilities." 34 U.S.C. § 30302. This purpose is contrary to Plaintiff's assertion that county investigators must not disclose PREA reporting information to state prison officials who have charge over the prison where the PREA report arose.

Defendants also point out that PREA "requires that IDOC cooperate with outside investigators and endeavor to remain informed about the progress of the investigation," 28 C.F.R. § 115.71, and that "IDOC is also required to conduct sexual abuse incident reviews at the conclusion of investigations and is subject to audits regarding PREA, 28 U.S.C. § 115.86; 28 C.F.R. § 115.401." Nothing in these implementing regulations shows that PREA requires outside agencies to keep their investigations confidential from the prison officials who are custodians of the prisoner who alleged a PREA incident. In fact, the regulations imply that PREA investigators have a duty to collaborate with IDOC officials on the investigation.

Defendants also persuasively reason:

> Prison officials would not be able to make meaningful change
> within the prison if they did not have access to the results of
> all PREA investigations. The available data and information
> of incidence of prison rape, sexual abuse and sexual
> harassment would not increase without prison officials having

**MEMORANDUM DECISION AND ORDER - 25**

> access to PREA investigation reports. Additionally, 28 CFR
> 115.73(b) requires that if the prison did not conduct the
> PREA investigation that it shall request the relevant
> information from the investigative agency in order to inform
> the inmate of the results.

Dkt. 48-1, p. 7.[5]

Accordingly, it is clear from the law that any alleged ISA or Ada County policies, procedures, or acts to implement collaborative efforts between the investigatory agency and prison officials are encouraged or required by, and in no way prohibited by, the PREA statutory and regulatory scheme. For these reasons, Plaintiff has failed to provide facts supporting the element that the object of the conspiracy must be violation of a constitutional right.

Further, Plaintiff has not shown that Congress created a private cause of action when it enacted PREA. Another federal district court explained the same conclusion in a similar case, where the plaintiff alleged:

> Defendants violated his rights under the PREA by failing to
> keep information from his PREA records confidential. This
> claim is without merit because the PREA does not provide a
> private right of action. Where neither the text nor the structure
> of a statute indicate that Congress intended to create new
> individual rights, "there is no basis for a private suit, whether
> under § 1983 or under an implied right of action." *Gonzaga
> Univ. v. Doe*, 536 U.S. 273, 286, 122 S.Ct. 2268, 153 L.Ed.2d
> 309 (2002).

---

[5] The ISA letter from ISA to the IDOC PREA coordinator, Teresa Jones, shows that ISA acts consistent with Tammara Tarvin's Declaration (Dkt. 42-4) that supports the position that ISA would have sent Plaintiff's letter to the IDOC PREA coordinator for investigation, not to Ada County. (*See* Dkt. 50, Exhibit-7- 002, p.14 of 24.)

*Sublett v. Beavers*, No. 5:17-CV-P195-TBR, 2018 WL 736272, at *4 (W.D. Ky. Feb. 6, 2018) (collecting cases). For this additional reason, Plaintiff has failed to state a claim upon which relief can be granted.

Further, there is no case law showing that there is any independent Fourteenth Amendment or other constitutional right to "confidentiality assurances," outside the PREA statutory scheme. For this additional reason and all of those above, the Court concludes that Defendants are entitled to summary judgment for failure to state a claim as to Plaintiff's conspiracy claims.

### 2. Due Process Claims

Plaintiff asserts that he has a due process right to have the investigation of his PREA complaint be free from ACSO investigators intimidating witnesses. Because there is no clearly-established law governing this particular issue, the Court concludes that Defendants are entitled to qualified immunity.

A motion for summary judgment on grounds of qualified immunity may be granted where the allegations on the face of the complaint, taken as true, are sufficient to show that the qualified immunity test is met. *See Cooper v. Pickett*, 137 F.3d 616, 622 (9th Cir. 1997). In § 1983 actions, the doctrine of qualified immunity protects state officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable and does not violate clearly established federal rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). A qualified immunity analysis consists of two prongs: (1) whether the facts as alleged by plaintiff establish a violation of a constitutional right, and (2) whether that right was clearly established given the state

of the law at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Courts may address either prong of the qualified immunity analysis first. *Pearson*, 555 U.S. at 236 (overruling *Saucier* only as to *Saucier*'s mandate that a court must consider the first prong before the second prong). The qualified immunity inquiry is "a pure question of law." *Elder v. Holloway*, 510 U.S. 510, 514 (1994) (citation omitted, punctuation altered). However, "under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

As to the first prong, the court considers whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. As to the second prong, qualified immunity will not apply when existing precedent shows that "the statutory or constitutional question [is] beyond debate," *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011) (citation and punctuation omitted), and every reasonable officer in the same circumstance would have understood "that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

A survey of case law shows there is none similar to this case. Within the criminal context, due process protects a defendant's right to call his own witnesses to help present his version of the facts and assist in his defense. *Webb v. Texas,* 409 U.S. 95, 98 (1972), *citing Washington v. Texas,* 388 U.S. 14, 19, (1967). A person has a due process right not to be subject to criminal charges on the basis of false evidence that was

**MEMORANDUM DECISION AND ORDER - 28**

deliberately fabricated by the government. *Caldwell v. City and Cnty. of San Francisco*, 889 F.3d 1105 (9th Cir. 2018). But, the United States Supreme Court has reiterated that "mere coercion does not violate the text of the Self–Incrimination Clause absent use of the compelled statements in a criminal case against the witness." *Chavez v. Martinez*, 538 U.S. 760, 769 (2003). Here, Plaintiff was not criminally charged for having falsified PREA allegations.

Within the prison segregation and discipline context, the Due Process Clause prohibits the government from depriving an individual of a liberty or property interest without following the proper procedures for doing so. *See Wolfe v. McDonnell*, 418 U.S. 539, 558-66 (1974). But preliminary to that question is whether a liberty interest lies. "The Due Process Clause standing alone confers no liberty interest in freedom from state action taken within the sentence imposed." *Sandin v. Conner*, 515 U.S. 472, 480 (1995) (citation and punctuation omitted). The Due Process Clause does not create a liberty interest in remaining in the general population or being free from different types of segregation. *See Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003) (citing *Sandin*, 515 U.S. at 485-86). The ACSO has no authority to segregate or discipline IDOC inmates, and there are no allegations that the ACSO Defendants did so here; thus, these cases are different from the context of Plaintiff's case.

However, even if the Court applies the *Sandin* liberty interest model here, and accepts that Defendants' alleged intimidation of witnesses resulted in discipline dictated by IDOC authority and decisionmaking, it is undisputed that Plaintiff received only light

sanctions for having falsified his PREA allegations. A punishment of light sanctions does not constitute a deprivation of a liberty interest. (*See* Case 315.)

Moving to the general civil litigation context, the Court finds it offers no aid to Plaintiff's position. A § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process. *See Paul v. Davis,* 424 U.S. 693, 711–12 (1976). Harm or injury to a person's interest in reputation, even where inflicted by an officer of the State, does not result in a deprivation of any "liberty" or "property" that requires due process of law. *Id*. at 693. To be actionable, a reputation injury must be accompanied by a constitutionally-recognized injury. *See id.* at 711–12. For example, the Fourteenth Amendment's concept of "liberty" includes "the liberty to follow a trade, profession or other calling." *Pleva v. Norquist,* 195 F.3d 905, 915 (7th Cir.1999) (internal quotation marks and citations omitted). No such liberty interest is at stake here.

Recent case law from the United States Supreme Court emphasizes that the lower federal courts are not permitted to analogize from one set of facts or one area of law to another when considering a qualified immunity defense. For example, in 2017, the Supreme Court repeated:

> Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined "at a high level of generality." *Ashcroft v. al–Kidd,* 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct.

**MEMORANDUM DECISION AND ORDER - 30**

3034, 97 L.Ed.2d 523 (1987). Otherwise, "[p]laintiffs would
be able to convert the rule of qualified immunity ... into a rule
of virtually unqualified liability simply by alleging violation
of extremely abstract rights." *Id.,* at 639, 107 S.Ct. 3034.

*White v. Pauly*, 580 U.S. 73, 79 (2017).

In a slightly similar case, *Costanich v. Dep't of Soc. & Health Servs*., 627 F.3d

1101 (9th Cir. 2010), state actors were accused of falsifying evidence in a child abuse

investigation, but the court declined to apply law governing criminal cases to that civil

context. There, the court held that, "given the distinctions between criminal prosecutions

and civil foster care proceedings, we cannot say that … that the right not to be accused

based on deliberately falsified evidence during civil investigations which could result in

the deprivation of protected liberty or property interests was … clearly established when

the conduct at issue in this case occurred…." *Id.* at 1115-1116. Accordingly, qualified

immunity was proper. *Id*. "Thus, going forward," the court said, "reasonable government

officials are on notice that deliberately falsifying evidence in a child abuse investigation

and including false evidentiary statements in a supporting declaration violates

constitutional rights where it results in the deprivation of liberty or property interests, be

it in a criminal or civil proceeding." *Id*. at 1114. Note that this case was focused on

falsification of evidence in a *child abuse* investigation setting, and is not analogous here;

even if it were, the case required the deprivation of a liberty or property interest, which is

not present here. *See id*. at 1116.

Plaintiff also argues for application of a line of cases holding that a substantive

due process violation exists—without having to show the violation of a specific liberty or

property interest—if the government state's conduct "shocks the conscience." *Crowe v. County of San Diego*, 608 F.3d 406, 431–432 (9th Cir. 2010) (interrogation techniques in police interviews of two teenagers found to shock the conscience). Reviewing the audio recordings of Ruby's interview with LaGrotta, the Court finds that nothing in the interview comes close to coercive, threatening language or tone of voice or inappropriate content; rather, the interview was conducted in a calm, respectful, and professional manner. (*See* Dkt. 37.)

Even if LaGrotta felt threatened by Ruby reading LaGrotta his rights, asking him to take a polygraph test, or asking him about Plaintiff's allegedly illegal activities, the interview cannot be compared to the one in *Crowe* found to "shock the conscience." There, on the first qualified immunity prong—whether the action could equal a constitutional violation—the court found:

> The Crowes and the Housers presented testimony from several expert and lay witnesses in support of their argument that the interrogations of Michael and Aaron violated the boys' substantive due process rights. Dr. Richard Leo, an expert in coerced confessions, described Michael's interrogation as "the most psychologically brutal interrogation and tortured confession that I have ever observed." Dr. Calvin Colarusso, Director of Child Psychiatry Residence Training Program at the University of California, San Diego, conducted a psychiatric evaluation of Michael and characterized his interrogation as "the most extreme form of emotional child abuse that I have ever observed in my nearly forty years of observing and working with children and adolescents." Robert Puglia, former Chief Deputy District Attorney for Sacramento County, testified in a sworn declaration that Michael's statements were the product of a "coercive police scheme." And finally, a juror in Tuite's criminal trial, who viewed the videotapes of the boys'

**MEMORANDUM DECISION AND ORDER - 32**

> interrogations, described the interrogations as "brutal and
> inhumane" and "psychological torture."
>
> One need only read the transcripts of the boys' interrogations,
> or watch the videotapes, to understand how thoroughly the
> defendants' conduct in this case "shocks the conscience."
> Michael and Aaron—14 and 15 years old, respectively—were
> isolated and subjected to hours and hours of interrogation
> during which they were cajoled, threatened, lied to, and
> relentlessly pressured by teams of police officers.
> "Psychological torture" is not an inapt description.

*Id.*, at 431–432.

The *Crowe* court held that the defendants were "not entitled to qualified immunity

because it was clearly established, at the time of the boys' interrogations, that the

interrogation techniques defendants chose to use did 'shock the conscience.'" *Id.* at 432.

For example, existing case law provided that interrogation of a minor must be conducted

with "the greatest care." *In re Gault*, 387 U.S. 1, 55 (1967). LaGrotta was not a minor

when interviewed, and the tone and content of the interview is not like that described in

*Crowe*.

In the adult defendant context, whether government actors' treatment of a

defendant "shocks the conscience" is determined by gauging whether coercive methods

were "brutal" and "offensive to human dignity," which violate the Due Process Clause.

*Rochin v. California,* 342 U.S. 165, 172, 174 (1952). In *Rochin*, the Court found that

officers who authorized a hospital doctor to force an emetic solution through a tube into

the suspect's stomach against his will that produced vomiting, which caused the suspect

to vomit up two morphine capsules he had swallowed upon arrest, met the standard of

brutal and offensive to human dignity. *Id*. at 166, 174. In LaGrotta's interview, nothing comes close to the facts in *Rochin*.

Therefore, here, the Court concludes that both prongs of the qualified immunity test apply to Ruby's acts: (i) there is insufficient evidence that Ruby intimidated LaGrotta, and, (ii) even if LaGrotta felt intimidated by the appropriate content of interrogation, there is no clearly-established law showing that Ruby should have known that the style or content of his respectful interrogation of a potential inmate witness about another inmate's potentially illegal activities amounted to a Fourteenth Amendment due process violation, or that Plaintiff had a liberty interest in not having his witnesses interviewed in that style or for that content.

Neither Bartlett nor Weires participated in the interviews; thus, qualified immunity for them is granted on the first qualified immunity prong. Therefore, all Defendants are entitled to summary judgment on their qualified immunity defense.

### 3.  Retaliation Claims

#### A.  *Standards of Law*

A First Amendment retaliation claim must allege the following: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, ... that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). Although a "chilling effect on First Amendment rights" is enough to state an injury, *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001), "bare allegations of

arbitrary retaliation" are insufficient to state a retaliation claim, *Rizzo v. Dawson*, 778 F.2d 527, 532 n.4 (9th Cir. 1985).

The timing of an official's action can constitute circumstantial evidence of retaliation, but there generally must be something more than simply timing to support an inference of retaliatory intent. *See Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995). Retaliation is not established simply by showing adverse activity by the defendant *after* protected speech; the plaintiff must show a nexus between the two. *See Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (stating that a retaliation claim cannot rest on "the logical fallacy of *post hoc, ergo propter hoc*, literally, 'after this, therefore because of this'").

In a § 1983 case, supervisors may be held liable if (1) they had "personal involvement in the constitutional deprivation," or (2) there exists "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (punctuation altered and citation omitted). Allegations sufficient to show a causal connection include: (1) "setting in motion a series of acts by others"; (2) "knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury"; (3) failing to act or improperly acting in "the training, supervision, or control of his subordinates"; (4) "acquiesc[ing] in the constitutional deprivation"; or (5) engaging in "conduct that showed a reckless or callous indifference to the rights of others." *Id*. at 1207-08 (internal citation quotations and punctuation omitted).

**MEMORANDUM DECISION AND ORDER - 35**

In addition, there is no respondeat superior liability under §1983, meaning that a person cannot be sued in their personal capacity merely for being a supervisor. *Id*. at 1207; *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (same).

## B. *Additional Undisputed Material Facts*

The evidence in the record shows that the standard policy and protocol between ACSO and IDOC was that ACSO was to take the lead on rape and sexual assault investigations. The record does not show that ISA communicated anything about Plaintiff's PREA allegations to ACSO.

The record contains no evidence of a reason or motive for any ACSO Defendant to retaliate against Plaintiff or to invalidate his PREA claim, the alleged motive. Nor is there any evidence in the record that the ACSO Defendants disciplined Plaintiff, changed his housing or classification, or had any authority or control over the IDOC and the decisions it made as to discipline, housing, or classification. (*See* Dkt. 42-2, Decl. Bartlett, p. 2; Dkt. 42-5, Decl. Weires, p. 3; Dkt. 42-6, Second Ruby Decl., p. 4.)

As to the alleged intimidation of inmate witness Anthony Barber, there is no evidence in the record that any ACSO official interviewed Barber. (*See* Dkt. 42-2, Decl. Bartlett, p. 2; Dkt. 42-5, Decl. Weires, p. 3; Dkt. 38-1, ACSO Report DR #19-3997 and Dkt. 37, audio recording (both sealed).)

There is no evidence from any party that Bartlett knew of or had any personal participation in the investigation. (*See* Dkt. 42-2, Decl. Bartlett, p. 2). Bartlett never had any contact with Plaintiff, James Davis, or any witnesses in this investigation. (*Id*.) Bartlett did not conduct the subject investigation or interview anyone. (*Id*.)

**MEMORANDUM DECISION AND ORDER - 36**

Defendant Weires fielded calls and emails from IDOC investigator Fraser, who asked Weires to investigate three correspondences Plaintiff authored and sent to the IDOC/ICPP. (*See* Dkt. 42-5, Weires Decl.) Weires asked ACSO Investigator Ruby Travis to conduct the investigation. Weires did not interview the Plaintiff and never had any contact with Plaintiff. (*Id.*) Nothing in the record reflects that Weires attended the interview of Robert LaGrotta or any other witness. (*See* Dkt. 42-5, Decl. Weires, p. 3; Dkt. 38-1, ACSO Report DR #19-3997 and Dkt. 37, audio recording (both sealed).)

Ruby, who interviewed Plaintiff, had never met Plaintiff, James Davis, or any other inmate witness before Ruby conducted the investigation. (*See* Dkt. 42-6, Second Ruby Decl., p. 3.) Ruby declares that when he conducted the interviews, he was in plain clothes rather than a uniform. (Dkt. 42-6, Second Ruby Decl., p. 3.) He did not have his service weapon or any weapons with him or on his person. (*Id.*) No evidence to the contrary exists.

Ruby informed each witness that the witness was not required to speak with Ruby if he did not want to, and Ruby informed each that he had the right to have counsel present with him. (Dkt. 42-6, p. 3, Second Ruby Decl.) Each person voluntarily agreed to speak with Defendant Ruby. (*Id.*)

### C. *Analysis*

Summary judgment for Bartlett is appropriate, as Plaintiff has failed to show that Bartlett had any personal participation or supervisory participation in the investigation, which is a required element of a § 1983 claim. Nor has Plaintiff shown any reason or motive Bartlett would have to retaliate.

**MEMORANDUM DECISION AND ORDER - 37**

Summary judgment for Weires is appropriate, because Plaintiff has failed to show that Weires, a supervisory investigator, did anything other than act in compliance with a longstanding ACSO-IDOC written collaboration agreement (sealed), field IDOC calls, review the evidence the IDOC official emailed, and assign Ruby to perform the investigation. Nor has Plaintiff shown any reason or motive Weires would have to retaliate against him or invalidate his PREA complaints.

Summary judgment for Ruby is appropriate on the claim that Ruby intimidated inmate Anthony Barber (Dkt. 17-1, p. 14; Dkt. 35-4, p. 13.) Nothing in the record shows that Ruby interviewed Barber. (*See id.*, *see* Dkt. 48-3, Third Ruby Decl.) Rather, Barber's Affidavits refers to "ISCC investigations guards" only. (Dkt. 17-1, p. 14; Dkt. 35-4, p. 13.)

The remaining issue is whether there is any genuine dispute of material fact about whether Ruby's conduct in the LaGrotta interview might constitute intimidation. Defendant desires to stand on the exact words of the LaGrotta Affidavit, which seems to point to the IDOC official as the state actor who intimidated LaGrotta:

> Admin had Ada County Detectives and ISCC Investigation officers pull me out and question me. That, they even read me my rights. That, this scared me but I stuck up for Carr by telling the truth explaining he wasn't doing anything wrong or harmful either towards others or himself. That, this approach and the truth seemed to bother them, and even upset them, so in fear of what they might do to me, I took their side saying 'maybe' Carr was up to something and his intent maybe to cause legal issues. That, I did this out of fear of retribution because ISCC and IDOC admin use housing transfers, DOR's and even Criminal Charges to retaliate against inmates like Carr and those who back him with witness statements and

> grievances . . . . That IDOC officials successfully intimidated
> me into making my friend Jody Carr look bad.…

(*See* Dkt. 17-2, p. 10–12 of 18.) Because LaGrotta says that both investigators pulled him out, questioned, him, and read him his rights, it is ambiguous whether the intimidating came from one or both of them. It is clear that LaGrotta was fearful of future retaliation by his custodians, the IDOC, but that does not necessarily mean that Ruby did not participate in intimidation that might lead to sanctions by the IDOC.

However, as the Court has noted above, that question is indisputably settled by listening to the LaGrotta interview. Reviewing the audio recordings of Ruby's interview with LaGrotta, the Court finds that nothing in the interview comes close to threatening language or tone of voice or inappropriate content, but the interview was conducted in a calm, respectful, and professional manner and was centered on appropriate content. (*See* Dkt. 37 (audio recording) (sealed).) Nothing in the LaGrotta affidavit shows he was physically threatened by either investigator. Nothing in the sealed investigation report, the sealed interviews, or the public record shows that Ruby would have had any motive for retaliation against Plaintiff.

Plaintiff's alternative claim that the IDOC investigator intimidated LaGrotta, and Ruby should have stopped the intimidation even if he did not participate in it, fails when one listens to the interview.[6] Nothing in the interview shows that the IDOC investigator

---

[6] To the extent that Plaintiff brings forward a new theory that Ruby should have stepped up and stopped the IDOC investigator from intimidating LaGrotta, the Court agrees that Ruby is entitled to qualified immunity on such a claim, because neither of the investigator's acts amounts to a constitutional violation and no clearly established law exists showing that Ruby's mere presence at a respectful interview would constitute a civil rights violation in this context.

**MEMORANDUM DECISION AND ORDER - 39**

intimidated LaGrotta. The investigators told LaGrotta he was only a witness, not a suspect in any wrongdoing. Regardless of what questions were asked of LaGrotta, he firmly stuck to his story that he thought Plaintiff was joking when Plaintiff asked if he could pay LaGrotta $1,000 to beat him up. The investigator and Plaintiff reasoned together that, even though LaGrotta perceived Plaintiff as joking, perhaps he was not. There was no point in the interview where LaGrotta was bullied into, intimidated into, or even led into changing his initial position. He did not change his position but only considered another possibility based on considering wider circumstances.

For all of the foregoing reasons, the Court concludes that Ruby is entitled to summary judgment on the retaliation claim. Having disposed of all of Plaintiff's claims, the Court concludes that Plaintiff's Amended Complaint is subject to dismissal with prejudice.

### REVIEW OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

As to Plaintiff's first ground for summary judgment, the Court concluded in its previous Order that Plaintiff had received all of the disclosures and discovery to which he was entitled, and that he failed to show how any late-provided or late-received items prejudiced him. (Dkt. 58.) Plaintiff's request for summary judgment on this ground is subject to denial.

Plaintiff's Motion for Summary Judgment and supporting exhibits contain much information that is irrelevant to the claims and defendants in this narrow case. The Court agrees with Defendants that Plaintiff has exhibit-dumped a truckload of documents on the Court without referring to the import of the exhibits individually in his briefing.

Plaintiff's exhibits focus on alleged IDOC wrongdoing and do not show that these particular ACSO Defendants have any authority, control, or influence over the IDOC and the decisions it made as to discipline, housing, or classification of Plaintiff.

As noted above, the Court has searched the record for anything that might support Plaintiff's claims against these Defendants, knowing he is at a disadvantage because of the sealed documents from IDOC, ISA, ACSO, and his other cases. The entirety of the record shows that this case is legally and factually frivolous. For all of these reasons, the Court concludes that Plaintiff's Motion for Summary Judgment against these Defendants is subject to denial.

## ORDER

**IT IS ORDERED:**

1.  Plaintiff's Motion for Summary Judgment (Dkt 35) is DENIED.

2.  Defendants' Motion for Summary Judgment (Dkt. 48) is GRANTED.

3.  To the extent that the Court did not permit Plaintiff to proceed on additional discovery or view the sealed documents referred to in this Order, the Court has reconsidered that decision and finds that Plaintiff's request for additional discovery or viewing of the sealed documents would not change the outcome of the pending summary judgment motions.

4.  Plaintiff's Amended Complaint and this entire action are DISMISSED with prejudice for the reasons set forth above and because they are legally and factually frivolous.

DATED:  March 27, 2024



Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge